# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## COLUMBIA DIVISION

CALVIN OLIVER,                          )
                                        )
    Petitioner,                     )
                                        )    NO. 1:05-00058
v.                                      )    JUDGE HAYNES
                                        )
TONY PARKER, Warden,                    )
                                        )
    Respondent.                     )

# M E M O R A N D U M

Petitioner, Calvin Oliver, filed this pro se action under 28 U.S.C. § 2254 seeking to set

aside his sentences for aggravated robbery, aggravated burglary, attempted aggravated robbery

and aggravated assault. Petitioner's convictions are based upon his guilty plea to these offenses

for which he received an effective sentence of twenty-six (26) years. Petitioner's claims are that

at his sentencing, his counsel failed to present mitigating evidence from medical experts on his

mental condition, so as to seek reduction of his sentences as authorized by state law and such

omissions constitute ineffective assistance of counsel in violation of his Sixth Amendment right.

The Court appointed the Federal Public Defender to represent the Petitioner.

    The Respondent filed an answer denying the merits of Petitioner's claim and arguing that

the state courts' rulings on his claims are reasonable interpretations and application of federal

law. The Court granted Petitioner's motion to expand the record to include a recent medical

evaluation of Petitioner. (Docket Entry Nos. 44, 45).

    Before the Court is the Petitioner's motion for summary judgment (Docket Entry No. 41)

that is based upon undisputed facts given the Respondent's failure to dispute them. (Docket

Entry No. 53). Petitioner argues that based upon his counsel's presentation of only lay witnesses

at Petitioner's sentencing and his counsel's opinion that Petitioner had a serious mental condition, these facts reflect that Petitioner's counsel failed to present competent expert proof that deprived Petitioner of mitigation of sentence under Tenn. Code Ann. § 40-35-113(8). Respondent argues that the state courts' rulings on the effectiveness of his counsel at sentencing are reasonable applications of federal law.

For the reasons set forth below, the Court concludes that the Petitioner's counsel at sentencing provided ineffective assistance of counsel by his failure to present expert medical proof on the Petitioner's mental condition for mitigation of the Petitioner's sentence under state law. The need for expert medical proof was manifest by the lay testimony on Petitioner's mental retardation that was presented on mitigation. Petitioner suffered prejudice from this omission because the state court cited the lack of expert medical proof as ground to deny mitigation of his sentence for a mental condition. Prejudice is also reflected in that Petitioner's sentence was almost twice the length of one of his co-defendants.

### A. Findings of Fact

### 1. State Appellate Findings

On the Petitioner's direct appeal, the Tennessee Court of Criminal Appeals made the following factual findings on Petitioner's underlying convictions.

> This case relates to the robbery of Christie Moore. At the defendant's guilty plea hearing, the state gave the following account of the crimes: On the night of March 18, 2002, the victim and her boyfriend were in bed when some men kicked open the victim's back door and forced their way into her home. The victim's boyfriend was awakened, poked in the back with a rifle, and told that he was going to be shot. The gun also was pointed at the victim, the victim's young daughter, and another woman who was staying in the home. The victim gave the men her pocketbook, and they fled the scene. When the police arrived, they found masks, gloves, and a rifle. The police also stopped a car that they had seen in the area

immediately before the crimes and arrested two of the robbers. At some point, the police arrested the defendant, who gave a statement and admitted his involvement in the offenses.

At the sentencing hearing, Christie Moore testified that around midnight on March 18, 2002, she was in bed and heard someone kick open her back door. She said that a man flung open her bedroom door and said, "Where is your money?" She said that another man with a rifle stepped in the room, asked for money, and pointed the gun at her head. She said that she told him she did not have any money and that he threatened to kill her. She said that she went into the living room, turned on the light, and that another man with a pistol told her to turn off the light or he was going to kill her. She said that four male robbers were in the house and that during the robbery, one of them stepped on her five-year-old daughter's puppy. She said that her daughter picked up the puppy and that the robber told her daughter that if she did not make the puppy be quiet they were going to kill her and the dog.

On cross-examination, Ms. Moore testified that she could not say the defendant was one of the robbers because all four of them were wearing masks. She said that the man with the rifle was in the living room with her and that the man with the pistol was in the hallway. She said that a third robber was in the hallway near the second bedroom and that the fourth man was in the kitchen. She could not say which one of the men was the defendant.

Officer James Whitsett of the Lewisburg City Police Department testified that he investigated the robbery. He said that another officer reported seeing a truck in the area and that the officer gave a description of the truck. He said that officers stopped the truck and arrested codefendants Mark Beard and Donald Harris. He said that Mr. Beard and Mr. Harris confessed to the robbery and told the police that the defendant and a juvenile named Chad McClain also had been involved. He said officers found masks in the truck and a rifle near the victim's home. He said that officers contacted the defendant and that the defendant denied being involved in the crimes. He said that about five or six days later, the defendant contacted the police and gave a statement in which he admitted participating in the offenses. In the statement, the defendant also said that he and Mr. Harris stayed outside the house while Mr. Beard and Mr. McClain went inside and robbed the victim. He said that the codefendants also gave statements and that some of them said the defendant had entered the house.

State v. Oliver, No. M2002-02438-CCA-R3-CD, 2003 WL 21997736 at *1. (Tenn.Ct.Crim.App.

Aug. 21, 2003).

3

As to sentencing stage of the proceedings, the Tennessee Court of Criminal Appeals found as follows:

> Judy Byrd from the Parole and Probation Department testified that she prepared the defendant's presentence report. She said that the defendant had many prior convictions, including theft of property valued more than $1,000, delivery of a Schedule II controlled substance, theft of property valued less than $500, car theft, and evading arrest. She said the defendant also had juvenile adjudications for theft of property valued more than $500 but less than $1,000 and that he was on probation and parole when he committed the offenses in question.
>
> Jerry Freeman, the Executive Director of the Lewisburg Housing Authority, testified for the defense that the defendant was a tenant on his property and that he knew the defendant when the defendant was very young. He said the defendant and his family were not normal. He said that the Department of Human Services (DHS) posted a list on the family's front door telling the family how to live and care for themselves.
>
> Tiffany Cox testified that she used to date the defendant. She said that the defendant's brain did not function normally, that he acted much younger than his age, and that he preferred to associate with teenagers. She said that the defendant was a very nice person and that he had never shown violence toward her. On cross-examination, Ms. Cox testified that she had known the defendant for about one year and that he did not use alcohol or drugs. She said that she would be surprised to learn that he had a prior conviction for delivering a Schedule II drug. She acknowledged that the defendant knew right from wrong but said that he did not think before he acted.
>
> Shawn Oliver, the defendant's cousin, testified that the defendant did not use his best judgment to make decisions and was influenced easily. He said that the defendant had never gotten into trouble by himself and that he had never seen the defendant act violently. On cross-examination, he acknowledged that he was not present during the offenses in question or during any of the defendant's other crimes. He acknowledged having prior convictions for simple possession and theft of property valued less than $500.
>
> Tyeann Brown testified that the defendant was a friend of her daughters, sons, and cousins and had visited her house frequently. She said that although the defendant was an adult, he was immature for his age. She said that the defendant was respectful and that she had never known him to be violent.

4

Latasha O'Neil testified that she used to be the defendant's neighbor. She said that the defendant would come to her for advice and that he would stay at her house in order to stay out of trouble. She said the defendant often talked to himself and needed mental help. She said that the defendant was not a bad person and wanted to be loved. On cross-examination, she said that the defendant did not get angry often and that he did not stay at her house after the robbery.

Codefendant Mark Beard testified that during the robbery, the defendant stayed in the front of the victim's house, did not have a weapon, and did not threaten the victim. On cross-examination, he said that he did not remember any of his codefendants protest committing the robbery. He acknowledged giving a statement to the police in which he said that as he and his three codefendants walked toward the victim's home, the defendant and Wayne Harris walked in the front of the group and that either the defendant or Mr. Harris kicked in the victim's back door. He also acknowledged stating that the defendant and Chad McClain had demanded money from the victim.

The defendant testified that he went to Wayne Harris's house and that Mr. Harris told him about a woman who had received eighty thousand dollars. He said that Mr. Harris wanted to rob the woman but that he, Mr. McCLain, and Mr. Beard refused. He said that Mr. Harris kept insisting that they rob the victim. He said that Mr. Harris, Mr. Beard, and Mr. McClain left Mr. Harris's house and returned with a rifle. He said that he and his three codefendants got into a truck and drove to the victim's house. He said that one of his codefendants kicked in the door and that he stayed at the door while his codefendants went inside. He said that Chad McClain threatened the victim's daughter with a rifle and that he was very sorry for the robbery. He also said that he needed mental health treatment and that he attended mental health classes while in prison. On cross-examination, the defendant testified that he did not understand what was going on. He said that the day before his sentencing hearing, he was in court for a violation of probation hearing and got mad and cursed during the hearing.

According to the presentence report, the then twenty-four-year-old defendant dropped out of high school after the eleventh grade but participated in some type of higher education program. The report shows that the defendant also has completed anger management and substance abuse programs. In addition to the prior convictions reported by Ms. Byrd, the report reflects that the defendant has been convicted of evading arrest, criminal impersonation, assault, and car burglary. The report shows that the defendant has juvenile adjudications for theft of property valued more than $1,000 but less than $60,000, theft of property valued more than $500 but less than $1,000, theft of property valued less than $500, joyriding, criminal trespassing, and shoplifting.

Id. at **2,3.

After his unsuccessful direct appeal, Petitioner filed a post-conviction petition asserting that his guilty plea was involuntary and that he had ineffective assistance of counsel who did not adequately explain his plea agreement. Oliver v. State, No. M2004-01564-CCA-R3-PC, 2005 WL 552897 at *1 (Tenn.Ct.Crim.App. March 3, 2005). Petitioner also asserted a claim that at his sentencing, counsel did not provide expert evidence on his mental condition. Id. The state trial court dismissed Oliver's petition and that order of dismissal was affirmed on appeal with the following pertinent factual findings.

> The twenty-six-year-old petitioner testified he met with trial counsel five or six times during the course of counsel's representation. He said he informed trial counsel that he could neither read nor write and asked him to inform the trial court about his "mental history." The petitioner stated he attended special education classes but never graduated from high school, participated in the Special Olympics, and was twice housed in a mental facility. He said trial counsel told him he had requested a mental evaluation, but the trial court had denied it. According to the petitioner, trial counsel brought him two plea offers from the State: one for sixty years, which he rejected, and a second one for twelve years, which he "jumped on." Trial counsel did not, however, read the plea form to him, tell him that he would be pleading open to the indictment, or explain what pleading open meant. The petitioner claimed he did not understand what he was pleading to and that he replied with the appropriate responses to the trial court's queries as to whether he was knowingly, voluntarily, and intelligently entering the pleas only because trial counsel instructed him in what to say.
>
> The petitioner testified he also informed substitute trial counsel, who took over his case after the guilty plea hearing, that he could neither read nor write. In addition, he made substitute counsel aware of his mental condition and, although he was not sure, thought he asked counsel to request a mental evaluation. He said he provided substitute counsel with a list of witnesses who testified on his behalf at the sentencing hearing. The petitioner's only complaint about substitute trial counsel was based on his claim that substitute trial counsel at some point told him to stop telephoning him and threatened that he would "mess [the petitioner's] case up," making it so that he could not file an appeal, if the petitioner kept "bugging" him.

6

*   *   *

Substitute trial counsel, who was appointed following trial counsel's heart attack, testified that he had been licensed to practice law since 1996 and that his practice primarily consisted of criminal defense work. He said he reviewed the presentence report, provided a copy to the petitioner, and met with him at the jail to discuss it with him. The petitioner said he had read the report but did not understand it, and counsel therefore read it aloud to the petitioner as they reviewed it. Substitute trial counsel testified that, during their meetings at the jail, the petitioner gave him handwritten lists of the names of witnesses he wanted to testify at his sentencing hearing and that he also received handwritten lists from the petitioner in the mail. One such list was accompanied by a note stating, "Here is a list of people I need to come to court to testify on my behalf. Your time is greatly appreciated. Calvin Oliver." In addition, he received several handwritten letters signed, "Sincerely[,] Calvin Oliver." Substitute trial counsel testified the petitioner never informed him that he could not read or write, and he assumed, therefore, that the handwritten items he received had been written by the petitioner. He conceded, however, that he never saw the petitioner read or write.

Substitute trial counsel testified he contacted or attempted to contact all of the witnesses named by the petitioner. Most of the people he contacted "had no idea who [the petitioner] was." He testified he could tell that the petitioner had some mental problems. Nonetheless, he never considered having a mental evaluation performed because, based on his professional experience, the petitioner's mental condition or defects did not rise to the level of a defense. The petitioner was able to communicate fairly well, and counsel never noticed him experiencing any problems with his memory with respect to the facts of the case or what they had discussed in previous meetings.

Substitute trial counsel adamantly denied that he ever told the petitioner to stop telephoning him or had threatened to sabotage his case:

And he's got a memory problem here today if he says I got mad and wouldn't accept his phone calls. Because, Number 1, accepting the phone calls and recording it down on my time sheets, I would have been paid for it.

I love to get the calls. I never once refused any phone calls from that individual. So he must have a memory problem in that respect.

Counsel agreed that, as reflected in the direct appeal opinion, he attempted to show that the petitioner suffered from some mental defects through the testimony of a number of witnesses he ultimately presented on the petitioner's behalf at the sentencing hearing. He said the petitioner was facing sixty years, but, after putting

7

on the "dog-and-pony show at the sentencing hearing," he got him twenty-six years rather than the fifty years that had been previously offered by the State. He, therefore, believed that he had done "a good job" and that he could not have achieved a better result.

At the beginning of the evidentiary hearing, post-conviction counsel informed the court that he was unable to locate Linda Taylor, a former Department of Human Services employee that the petitioner had wanted him to present at the hearing. At the conclusion of the hearing, the assistant district attorney provided post-conviction counsel with a contact number for Ms. Taylor, and the post-conviction court stated that it would delay entering its order to allow counsel time to contact Ms. Taylor and determine if she had any information that would warrant reopening his proof. Post-conviction counsel subsequently informed the court that he had spoken with Ms. Taylor and learned that she would not be able to provide any useful information.

Id. at **2, 3, 4.

Petitioner notes other evidence presented in the state record. After Petitioner's counsel suffered a heart attack, the state trial court appointed Larry Wallace to serve as his substitute counsel for sentencing. (Docket Entry No. 18, Addendum 1 at p. 77, Order and Docket Entry No. 15, Addendum 7, PC Transcript at 74). After interviewing Petitioner, Wallace "could tell that Petitioner . . . wasn't playing with a full deck." (Docket Entry No. 15, Addendum 7, Id. at 92). Wallace deemed Petitioner's mental condition sufficiently serious, but did not employ medical or expert assistance for sentencing. Id. at pp. 92-93.

Yet, at sentencing, Wallace presented several lay witnesses who testified about Petitioner's mental condition. See Docket Entry No. 15, Addendum 2, Sentencing Transcript at p. 80. Petitioner's former girlfriend's specific testimony was: "It was like his [Oliver's] brain didn't function right . . . his brain is like on a low level." Id. p. 52. A neighbor opined of the Petitioner: "He do need help, I can tell. He is mentally staged [sic]." Id. at p. 71. Petitioner's cousin stated that "I never even had any knowledge of him having mental health treatment, but I

8

know he had a mental health problem." <u>Id.</u> at 59.  The housing project manager, where Petitioner lived reported that he "personally observed a list that was stapled to the wall or taped to the wall [of the Oliver residence] that explained to them when to get up; what they had to do when they got up; how to cook their breakfast, those type of things." <u>Id.</u> at p. 49.

      As to Petitioner's mental condition, Wallace, his counsel argued at sentencing: "But I think here is this case, Judge, that you have a young man here, because of youth or age and his mental condition, that I submit to the Court, you heard people testify that he acts odd on occasions . . . I am going to argue [mitigation-factor] number 8: **The defendant was suffering from a mental or physical condition that significantly reduced his culpability for the offense**.  However, the volunteer use of intoxicants does not fall within this purview.  We are not arguing that he was intoxicated.  As a matter of fact, I was told that in under number 13 - you have heard people say he doesn't even do anything.  As to his conviction for the cocaine, I don't know anything about it.  I don't know if he was just selling it or possessed it or what, but I believe if was possession for resale.  It doesn't necessarily mean that he was using the stuff.  That may go both ways for and against Mr. Oliver.  <u>Id.</u> at pp. 101-03. (emphasis added).

      With his state post-conviction petition, Petitioner filed sixty pages of institutional records that included psychological evaluations of him from the ages 9 to 17.  (Docket Entry No. 42 at ¶ 1).  Those documents reflect that Petitioner was raised in a predominantly mentally-retarded household: "The major problem for this family seems to be intellectual limitations.  **Calvin is mildly retarded with two mentally retarded sisters.**  The remainder of the family seems to be functioning on the level of mildly retarded.  Ms. Oliver who is very limited intellectually and has never been employed has difficulty understanding simple questions." <u>Id.</u> at ¶ 2 (emphasis

9

added).  According to those documents, Petitioner was repeatedly classified at age 9 and in his late teenage years as mildly mentally retarded.  One report states: "His full Scale IQ of 64 places him in the mentally retarded range of cognitive functioning . . . His adaptive behavior composite score of 61 places him in the 0.5 percentile, placing him at the mentally retarded range in adaptive behavior."  Id. at ¶ 3).

Petitioner spent a substantial amount of his youth lacking adequate parental guidance and raised in institutions when he was 15.  Id. at ¶ 4.  Petitioner cannot read or write.  (Docket Entry No 15, Addendum 6A at p. 29).  Wallace, Petitioner's counsel at sentencing, opined that " I could - based upon my having taken psychology and my major, yes.  I could tell that Mr. Oliver . . . wasn't playing with a full deck . . . But my major and my professional experience has taught me that it wasn't going to rise to the level of a defense . . . I have taken various psychology courses for my major in arson investigation."  (Docket Entry No. 42 at ¶ 42).  As to why he did not obtain expert testimony, Wallace responded: "Because at that point in time for a sentencing hearing, I don't think it would have been appropriate."  Id. at ¶ 41.  Wallace elected to present what he considered a "dog-and-pony show" of lay witnesses.  Id. at ¶ 43.

At sentencing, the state trial judge stated that  "[i]t is pretty obvious that Mr. Oliver has a problem," id. at ¶ 3, but opined that the problem did not "rise to the level of a mental condition" under § 40-35-113(8).  The trial court stated her belief that "Mr. Oliver is probably easily led."  Id. at ¶ 35.  The trial judge  mitigated Petitioner's sentence under a catch-all mitigation provision of state law.  Id.  The trial judge, however, explicitly stated that she was not "plac[ing] great weight on the mitigating factors."  Id. at ¶ 36.  As the trial court explained:

Mr. Oliver is not right.  He has got a problem, and I am not sure how that problem

10

can be solved. I believe I first met Mr. Oliver when he was a juvenile, and I was Assistant District Attorney General, and had an occasion to observe him then, and that is not in this record. The Court can't take at least that - the Court's personal observations into account, but I can tell you that the Court has - can take judicial notice of its own records since I have been on the bench. It is pretty obvious that Mr. Oliver has a problem. But that problem does not, in the Court's mind, rise to the level of a mental condition or any other substantial grounds to excuse his behavior.

(Docket Entry No. 15, Addendum Number 2 at p. 106).

Thus, the sentencing judge declined to apply Tenn. Code Ann. § 40-35-113(8) because the record lacked medical proof of a mental deficiency. Id. at ¶ 30. The trial court stated: "neither would [the record] support 40-35-113(8); that is, that it would significantly reduce his culpability, **based upon the lack of there being any expert testimony to that effect**." Id. at ¶ 31 (emphasis added). The trial judge, however, mitigated Petitioner's overall sentence from 27 years down to 26 years, due to the catch-all mitigation factor. Id. at ¶ 32. The judge thought the sentence was 24 years, but erred in her math. Id. at ¶ 33.

At sentencing, the trial court cited his extensive criminal history, including offenses dating back to age 11. Id. at Addendum Number 2 at pp. 104-115. Due to that history, Petitioner qualified as a Range II offender that increased the level of his punishment. Id. at p. 104. As a result, Petitioner's potential sentence at the outset ranged from 12 to 60 years. The state trial court cited Petitioner's prior history of unwillingness to comply with the conditions of sentence involving release into the community. The state trial court specifically noted that Petitioner had previously been placed on probation several times and on each occasion, had committed further offenses, including the fact that he was on parole at the time of the instant offense. Id. at pp. 109-10. Yet, the trial court rejected the Respondent's contention that Petitioner be considered a

11

leader in the commission of the offense to further enhance the sentence. Id. at p. 105. Contrary to the State's argument, the trial court determined the Petitioner did not qualify as a dangerous offender. Id. at p. 112.

On appeal, Petitioner argued that the trial judge erred by refusing to apply § 40-35-113(8) for his mental retardation and indicated that his mental retardation should be a "given." (Docket Entry No. 42 at ¶ 37). In response, the State emphasized that the record "contains no documentation of any type of any defect or mental retardation." Id. at ¶ 35. On direct appeal of the mitigation issue, the Tennessee Court of Criminal Appeals affirmed, stating: "the defendant presented no **expert** testimony to support his claim that he is mildly mentally retarded." 2003 WL 21997736 at *6. (emphasis added). That court found as to Petitioner's counsel at sentencing, that "the transcript of the sentencing hearing reflects that, in addition to the Petitioner, substitute counsel presented nine [lay] witnesses in the Petitioner's defense, many of whom testified about the Petitioner's mental deficiencies and limitations and the fact that he was easily influenced by others." Id. at ¶ 48.[1] Petitioner's co-defendant, Mark Beard, received a

---

[1]Plaintiff filed a recent Forensic Neuropsychological Evaluation of Calvin Oliver, to assess his mental-health records, including those he filed with his pro se state post-conviction petition. The Court, however, does not rely on this submission. Dr. Pam Auble also reviewed the sentencing record and concluded:

> There was substantial mitigating evidence available to present at Mr. Oliver's sentencing hearing in 2002. There was a wealth of information available to document that Mr. Oliver has been mentally retarded and language delayed since early childhood. There was also substantial information that documented that his mother and other family members were mentally limited, and that is mother was unable to be an effective parent to her son. His father was not present in his life. Mr. Oliver was still illiterate and had limited verbal skills in 2002 which could have been documented with a psychological evaluation. Because of his deficits, he is more susceptible to the influence of others than normal. Despite the fact that he was older than is three co-defendants, it is likely that he was not as intelligent as them. Although several lay witnesses testified at the sentencing hearing that they believed that something "was wrong" with Mr. Oliver, their testimony was vague and the judge was unable to rely upon it as substantial mitigation indicating that Mr. Oliver had a significant mental condition and that he was susceptible to influence and

12

sentence of 14 years.

On his post-conviction appeal, the Tennessee Court of Criminal Appeals credited the

testimony of Petitioner's counsel and made the following findings:

> Substitute trial counsel denied that he ever told the petitioner to stop telephoning
> him, refused any of his calls, or threatened to "mess up" his case. He said he
> attempted to contact the potential witnesses the petitioner wanted to testify on his
> behalf, and he called the number of witnesses on the petitioner's behalf at the
> sentencing hearing. In this regard, we note that the transcript of the sentencing
> hearing reflects that, in addition to the petitioner substitute trial counsel presented
> nine witnesses in the petitioner's defense, many of whom testified about the
> petitioner's mental deficiencies and limitations and the fact that he was easily
> influenced by others. See Calvin Jerome Oliver, 2003 WL 21997736, at - - - 2-3.

> Thus, we conclude that the petitioner has not met his burden of showing by clear
> and convincing evidence that trial counsel were deficient in their representation.
> The petitioner, is not, therefore, entitled to post-conviction relief on the basis of
> his claim of ineffective assistance of counsel.

2005 WL 552897 at * 6.

## B. Conclusions of Law

Petitioner's habeas petition is governed by the provisions of the Antiterrorism and

Effective Death Penalty Act of 1996 ("AEDPA"), 110 Stat. 1274. Lindh v. Murphy, 521 U.S.

320, 336 (1997). Under the AEDPA, federal courts may not grant habeas relief for claims

adjudicated on their merits in a state court proceeding, unless that state court proceeding:

(1) resulted in a decision that was contrary to, or involved an unreasonable

---

> domination by others. It was also left unexplained why Mr. Oliver had attempted
> to withdraw his guilty plea . . . This was most likely because his limited verbal skills
> resulted in him failing to understand some aspect of the guilty plea. Instead, the
> judge apparently took the attempt to withdraw his guilty plea as a failure to accept
> responsibility for his actions.

(Docket Entry No. 43-1, Auble Evaluation of Oliver at pp 12-13).

application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding:

28 U.S.C. § 2254(d)(1) and (2).

In Williams v. Taylor, 529 U.S. 362, 413 (2000), the Supreme Court stated that a state court judgment is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court on a set of materially indistinguishable facts." In such instances, the Supreme Court held that a federal habeas court may grant a writ. Id. The Supreme Court interpreted the language "clearly established Federal law, as determined by the Supreme Court of the United States"as referring to "holdings as opposed to dicta" of its decisions at the time of the state court decision. Id. at 412. Moreover, the relevant analysis is "to apply a rule of law that was clearly established at the time [the Petitioner's] state court conviction became final." Id. at 390, accord, Joshua v. Dewitt, 341 F.3d 430, 436 (6th Cir. 2003). In Bell v. Cone, 535 U.S. 685, 693 (2002), the Court reiterated that AEDPA modified a federal court's role in reviewing state prisoner applications "in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under the law."

Under the "unreasonable application" clause, the Supreme Court stated that a state court judgment results in an "unreasonable application" of clearly established federal law "if the state court correctly identifies the governing legal principle from [the Supreme Court's] decision but unreasonably applies [that principle] to the facts of the particular case." Id. at 694 The district court "must presume that all determinations of factual issues made by the state-court are correct

14

unless the defendant can rebut that presumption by clear and convincing evidence." Mitchell v. Mason, 325 F.3d 737-38 (6th Cir. 2003) (citing 28 U.S.C. § 2254(e)(1).

Yet, the Supreme Court explained that a state court's application of clearly established federal law must be "objectively unreasonable," and a federal habeas court may not grant habeas relief "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams, 529 U.S. at 409, 411. A state court's application of federal law is unreasonable and habeas relief may be granted if the "state court decision is so clearly incorrect that it would not be debatable among reasonable jurists." Herbert v. Billy, 160 F.3d 1131, 1135 (6th Cir. 1998) (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir. 1996)).

As to Petitioner's claim of ineffectiveness of his counsel at his sentencing, in Mitchell v. Mason, 325 F.3d 732 (6th Cir. 2005) the Sixth Circuit identified two broad categories of ineffective assistance of counsel claims under the Supreme Court's decisions: (1) the actual or effective absence of counsel at a critical stage of the proceeding for which a presumption of prejudice arises; and (2) counsel whose performance was deficient on specific issues and that deficiency was demonstrably prejudicial to the defendant. As that Court explained:

> In United States v. Cronic, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984) the Supreme Court held that an appeals court must reverse a criminal defendant's conviction "without any specific showing of prejudice to defendant when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding." . . . In Williams, the Supreme Court confirmed the vitality of this "per se" approach, noting that while the Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), test for ineffective assistance of counsel, requiring proof of deficient performance and prejudice, provides guidance for resolving virtually all ineffective assistance of counsel

15

claims, there are "a few situations in which prejudice may be presumed."
Williams, 529 U.S. at 391 . . . (citing Strickland, 466 U.S. at 692, 104 S.Ct. 2052).
We have recently applied the presumption-of-prejudice test to a claim of
ineffective assistance of counsel. Olden, 224 F.3d at 568 (prejudice is presumed
when counsel is absent during prosecution's presentation of evidence that
implicates defendant because such absence occurred during "critical stage" of
trial).

Id. at 740.

> Within the first category are three types of presumptive ineffectiveness of counsel:

> The first is the complete denial of counsel, in which "the accused is denied the
> presence of counsel at 'a critical stage.'" Bell, 122 S.Ct. at 1851 (quoting Cronic,
> 466 U.S. at 659, 104 S.Ct. 2039). The second is when counsel "'entirely fails to
> subject the prosecution's case to meaningful adversarial testing.'" Id. (quoting
> Cronic, 466 U.S. at 659, 104 S.Ct. 2039). The third is when counsel is placed in
> circumstances in which competent counsel very likely could not render assistance.

Id. at 742.

Here, given the state courts' findings, the Court concludes that Petitioner's ineffective

assistance of counsel claims fall under the Strickland standard.

To prevail on these claims of ineffective assistance, Petitioner must demonstrate, under

the totality of the circumstances that at sentencing, his counsel performed deficiently and that

counsel's performance was prejudicial. Strickland, 466 U.S. at 695. As the Supreme Court has

explained:

> First, the defendant must show that counsel's performance was deficient. This
> requires showing that counsel made errors so serious that counsel was not
> functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.
> Second, the defendant must show that the deficient performance prejudiced the
> defense. This requires showing that counsel's errors were so serious as to deprive
> the defendant of a fair trial, a trial whose result is reliable.

Id. at 687.

Case 1:05-cv-00058   Document 55   Filed 12/21/07   Page 16 of 22 PageID #: 1280

As to the "performance" inquiry, "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." Id. at 688. Under Strickland, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Id. at 691. As to the duty to investigate:

> These standards require no special amplification in order to define counsel's duty to investigate, the duty at issue in this case. As the Court of Appeals concluded, strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitation on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.
>
> The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable. In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decision, just as it may be critical to a proper assessment of counsel's other litigation decisions.

Id at 690-91.

As to sentencing, defense counsel must adequately investigate any mental deficiencies of their clients that are commonly recognized as valid reasons to reduce personal culpability for wrongful acts. See e.g., Atkins v. Virginia, 536 U.S. 304, 318 (2002) (describing significance of

17

mental retardation in context of a defendant with mild mental retardation). In <u>Glenn v. Tate</u>, 71 F.3d 1204, 1211 (6th Cir. 1995) the Sixth Circuit agreed with "[o]ur sister circuits [that] have had no difficulty in finding prejudice in sentencing proceedings where counsel failed to present pertinent evidence of mental history and mental capacity".

In a non-death penalty habeas action, the Sixth Circuit recognized defense counsel's duty to investigate the client's mental condition. In <u>Dando v. Yukins</u>, 461 F.3d 791, 798- 99 (6th Cir. 2006) a habeas petitioner with a history of mental problems pled guilty to several robbery and related charges. That petitioner asserted that her counsel was ineffective for failing to seek a mental health expert for potential defense. The Sixth Circuit agreed that:

> Dando's counsel failed here to adequately investigate the availability of a duress defense and the related possibility that Dando suffered from Battered Women's Syndrome.
>
>                              * * *
>
> Investigation of this potential defense was a minimal requirement to providing adequate representation at the plea stage, particularly since Dando herself told her attorney about her history of abuse, and even suggested the need for a mental health expert. <u>See</u> O'Hara v. Wigginton, 24 F.3d 823, 828 (6th Cir.1994) ("counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary" (quoting <u>Strickland</u>, 466 U.S. at 690-91, 104 S.Ct. 2002)). <u>Although courts are typically required to show heightened deference to an attorney's strategic decisions supported by professional judgment, where a failure to investigate does not reflect sound professional judgment, such deference is not appropriate.</u> <u>Id.</u> The evidence in this case suggests that the attorney's decision was not an exercise in professional judgment because it reflected a misunderstanding of the law regarding the availability of a mental health expert. The state courts' determination that Dando's counsel's performance was not inadequate misapplied clearly established Supreme Court precedent that required counsel to adequately investigate potential defenses.

<u>Id.</u> (emphasis added). The Court also noted that "[i]t would seem that an expert would be essential whenever mental health is a potentially relevant issue regarding the defendant's

18

essential whenever mental health is a potentially relevant issue regarding the defendant's culpability." Id. at 799 n.2.

At the time of the Petitioner's sentencing hearing, Tennessee law authorized mitigation of a sentence when an offender suffered "from a mental or physical condition that significantly reduced the defendant's culpability for the offense." Tenn. Code Ann. 40-35-113(8). Tennessee courts applied this mitigation statute to a defendant with a mild mental retardation. State v. Blackstock, 19 S.W.3d 200, 211-12. (Tenn.2000);[2] State v. Fortner, 2004 Tenn.Crim.App. LEXIS 555 (Tenn.Crim.App. 2004). "[T]here is abundant evidence that [the mentally retarded] often act on impulse rather than the pursuit of a premeditated plan," "by definition they have diminished capacities to understand and process information, to communicate, [and] to abstract from mistakes and learn from experience," and "in group settings they are followers rather than leaders." Atkins, 536 U.S. at 318. Mental retardation usually requires proof that the individual's limitations were manifest before the age of 18. See also Dickerson v. Bagley, 453 F.3d 690, 698 (6th Cir. 2006) (noting that an IQ of 77, was above the cut-off for metal retardation).

Here, at the time of Petitioner's sentencing, state law afforded mitigation of a sentence for a mental condition. The state record reflects that Petitioner's counsel had ample facts through lay witnesses of the Petitioner's mental condition. Petitioner's counsel at sentencing personally opined that Petitioner was not "playing with a full deck." Petitioner's state post-conviction record contains medical records that document Petitioner has an I.Q. of 64 and has mild mental retardation. The medical evidence of Petitioner's medical condition was readily available as

_____

[2]The lower-court decision notes that the mental retardation at issues was mild.  State v. Blackstock, 1997 Tenn.Crim.App. LEXIS 1236 at *19 (Tenn.Crim.App. 1997).

19

reflected in the records that Petitioner filed with his state post-conviction petition. These records

included a mental evaluation preformed on Petitioner by the school system or in Petitioner's

placement in the state-run juvenile institutions. Petitioner's original counsel examined the

mental-health records from Petitioner's Marshall County court filed on a previous conviction.

(Docket Entry No. 15, Addendum 6 at pp. 57-58). The state trial judge acknowledged that '[i]t is

pretty obvious that Mr. Oliver has a problem," but cited the lack of medical evidence on the level

of a mental condition. The sentencing judge found: "neither would [the record] support 40-35-

113(8); that is, that it would significantly reduce his culpability, based upon the lack of there

being any expert testimony to that effect." (Docket Entry No. 15, Addendum 2, Sentencing

Transcript at pp. 105-106). The trial court also agreed that "Mr. Oliver is probably easily led."

Id. at p. 107.

      In these factual circumstances, as in Dando, defense counsel at sentencing was on actual

notice of substantial mitigating facts, but Petitioner's counsel failed to secure a medical expert

for mitigation issues at sentencing. The Court concludes that Petitioner's counsel ignored the

clear evidence of Petitioners' mental condition and retardation that required expert medical proof

of a mental condition to justify a mitigation of his sentence mitigation is available for this

condition under Tenn. Code Ann. § 40-35-113(8). The Court concludes that Petitioner's counsel

failed to investigate known medical evidence that was clearly established by Petitioner's lay

witnesses and clearly relevant under Tennessee's sentencing laws.

      To establish prejudice due to his counsel's errors or omissions at sentencing, Petitioner

must establish a reasonable probability that but for counsel's unprofessional errors, the result of

the proceeding would have been different. A reasonable probability is a probability sufficient to

20

undermine confidence in the outcome. <u>Williams</u>, 529 U.S. at 390-91. In a word, "[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." <u>Strickland</u>, 466 U.S. at 694. Where the issue involves mitigation evidence, the standard is: "the likelihood of a different result if the evidence had gone in" and whether that evidence is "sufficient to undermine confidence in the outcome actually reached." <u>Rompilla</u>, 125 S.Ct. at 2469. The Sixth Circuit agreed with other circuits that: "have had no difficulty in finding prejudice in sentencing proceedings where counsel failed to present pertinent evidence of mental history and mental capacity." <u>Glenn</u>, 71 F.3d at 1211.

The Court concludes that the trial court's finding that "it would not significantly reduce his culpability, based upon the lack of there being any expert testimony to that effect," establishes the prejudice element of <u>Strickland</u>. In addition, the trial court's opinion that Petitioner would probably be "easily led" reinforces the prejudice due to the lack of expert proof. Although the trial judge mitigated Petitioner's sentence to 26 years from 27 years, another defendant in these offenses received a sentence of 14 years. Given Petitioner's serious mental condition, the Court concludes that with reasonably effective assistance by counsel, in all likelihood, Petitioner would have received a lesser sentence, than 26 years.

On direct appeal, the Tennessee Court of Criminal Appeals relied on Petitioner's counsel's omission of expert proof to deny Petitioner relief on the mitigation issue. In the post-conviction appeal, that Court ruled that Petitioner's sentencing counsel had not erred, but performed reasonably by relying solely upon lay testimony. The Court concludes that these decisions are internally inconsistent and therefore are not unreasonable applications of

21

Strickland's requirement that counsel must satisfy the objective standard of reasonable professional assistance of counsel. See Glover, 531 U.S. 198 (applying Strickland to noncapital sentencing); Dando, 461 F.3d at 798-799 n.2.

Thus, the Court concludes that the writ should issue and the State shall provide the Petitioner with a new sentencing hearing within sixty (60) days from the date of the entry of the accompanying Order.

**ENTERED** this the _____ day of December, 2007.

WILLIAM J. HAYNES, JR.
United States District Judge